[No. 6741. Decided October 10, 1907.]

LEE H. ROBINSON, *Respondent*, v. SPOKANE TRACTION COMPANY, *Appellant*.[1]

DAMAGES—EVIDENCE—ADMISSIBILITY—APPEAL—HARMLESS ERROR. In an action for personal injuries resulting in neurasthenia, it is error to exclude defendant's evidence tending to show the effect that the worry and excitement incident to the lawsuit would have upon the plaintiff; but the same may be without prejudice upon a proper reduction of the verdict (RUDKIN, J., dissenting).

APPEAL—REVIEW—HARMLESS ERROR. Error in instructions emphasizing the importance of, or commenting on certain evidence, may be without prejudice upon ordering a reduction of the verdict.

DAMAGES—INJURIES—EXCESSIVE VERDICT. A verdict for $8,000 for injuries to the back, plaintiff being a young man 23 years of age, is excessive and should be reduced to $5,000, where, upon conflicting evidence, it overwhelmingly appeared that the injuries resulted only in neurasthenia instead of myelitis as claimed by defendant.

Appeal from a judgment of the superior court for Spokane county, Poindexter, J., entered October 27, 1906, upon the verdict of a jury for $8,000 damages for personal injuries sustained by a passenger in a street car collision. Affirmed on condition of remitting $3,000.

[1]Reported in 91 Pac. 972.

*Graves, Kizer & Graves*, for appellant.

*Kenyon & Setters*, for respondent.

Root, J.—This is an action for damages for personal injuries sustained by plaintiff while riding in one of defendant's street cars. From a judgment for $8,000, the defendant appeals.

On the trial of the cause the defendant admitted negligence, and the only questions submitted to the jury were those having to do with the amount of the recovery. The facts revealed by the evidence are about these: Plaintiff was seated in the forward end of the car, with one shoulder against the end of the car and the other against the side, his back being toward the corner. A collision occurred, and he says that he was thrown from the front of the car and struck his breast against a seat. After the collision he rode down town, alighted from the car, and walked into a tailor shop, where he was employed as a solicitor. Shortly thereafter a physician was sent for, who came and made a casual examination of plaintiff and advised him to go to the hospital, where the doctor soon followed. This doctor says that at the hospital he stripped plaintiff and made a thorough examination, and found no evidence of any injury, no mark or contusion; that plaintiff complained of pain behind the left shoulder blade. The doctor found his respiration and pulse normal, and no loss of motion or paralysis of any description. He directed that he apply some ointment to his back and take a rest.

Shortly after this, the family physician of plaintiff was summoned and made an examination of plaintiff, and took charge of the case from that time on, making visits upon him as follows: One in January, eight in February, one in March, one in April, one in May, and gave him one prescription in July. The accident occurred January 31, 1906, and the case came on for trial October 11, 1906. The family physician was a witness for plaintiff upon the trial. Testifying to his first examination, he stated as follows:

"He was apparently suffering a great deal of pain, the muscles of his back were rigid, and upon movement or touch it seemed to cause him a great deal of distress.   Q. Were there any other evidences of injury?   A. No; I do not remember of any other at the present time."

This doctor, until a few weeks before the trial, considered plaintiff's condition as one of neurasthenia, and plaintiff's complaint alleged that the injuries had induced and resulted in a neurasthenic condition.   Upon the trial, however, plaintiff changed this theory and urged that the injury had resulted in myelitis instead of neurasthenia.   Neurasthenia is a somewhat indefinite term applied to certain nervous conditions, while myelitis is a diseased condition or degeneration of the spinal cord, and is regarded as a much more serious ailment than neurasthenia.   The family physician, upon the witness stand, was asked as to the present nervous condition of plaintiff.   He answered: "He seems to be extremely nervous at the present time, in the way that he had not full control of his nervous faculties and his nerves are very irritable, more irritable than a nervous person."   It was urged on behalf of plaintiff that there was a fracture of the rib where it joins the twelfth dorsal vertebra.   With reference to this the family physician testified as follows:

"Q. Did you diagnose the case as fracture of the rib at the twelfth dorsal vertebra?   A. I could not.   Q. On the contrary, you diagnosed it as not being any fracture, did you not?   A. I think I did, yes, sir."

It was the contention of plaintiff that the fracture had superinduced myelitis.   The following questions were propounded to this physician, and answered as indicated:

"Q. Now, what kind of myelitis is this?   A. Well, there is a lesion of the spinal cord and degeneration of the tracts of the spinal cord; but I am not up in nervous diseases—not enough to know the distinction between the anterior and positive or lateral.   Q. You are expert enough to know it is myelitis, but not expert enough to know what kind of myelitis it is?   A. Yes."

20—47 WASH.

Besides this physician, the plaintiff put upon the stand one other. He made some radiographs with an X-ray machine, and gave it as his opinion that there was a fracture of the twelfth dorsal vertebra, or of the rib where it connects therewith. He was unable, however, to give any dimensions whatever of the fracture, or any definite description thereof. The pictures were placed in evidence. Each of these two doctors gave it as his opinion that plaintiff was suffering from myelitis, and each testified that he thought that a portion of the conditions now existing would be permanent. Plaintiff remained at the hospital about one week and was then taken to his home, where he remained for about three months before going out. The chart record kept by the nurse at the hospital was introduced in evidence. The record of the first night was not on the chart. The latter showed that the plaintiff slept well every night except the first night recorded, when he slept only part of the night. The nurse who prepared the chart and waited upon respondent testified that the attending physician directed that certain medicine to produce sleep be given the patient in case he was unable to sleep, but that the medicine was not given, for the reason that he slept readily without such medicine. Plaintiff testified that he took medicine, after leaving the hospital, to make him sleep.

The defendant placed upon the witness stand six physicians. One of them was a doctor whom the plaintiff or his family had called to examine him, and most of them were physicians who had been appointed as a commission to make an examination of the plaintiff's condition. All of these doctors swore positively that plaintiff's condition was not myelitis, but neurasthenia. Most of these doctors were men of extended experience, and some of them of many years' experience with nervous ailments and conditions. Several of them showed themselves to be well acquainted with radiographs, and upon examination of the pictures in evidence, stated positively that there was nothing whatever therein to show any injury to the

vertebra or ribs, or anything whatsoever abnormal. None of the doctors on either side found any scars or any outward indications in an injury, except that shortly after the injury the muscles in the small of the back were somewhat swollen. The plaintiff appeared to still have a pain in that region, leaned forward when sitting, and in rising from a sitting position appeared to require a cane or something to take hold of in order to rise, and was evidently in a nervous condition, frequently contracting various muscles of the body and acting uneasily. Plaintiff testified that he had lost some twenty pounds in weight, and that he had suffered much pain and sleeplessness and was unable to walk without canes. His skin was not of good color. Some of the muscles of the hips and legs did not appear to act normally.

Plaintiff placed in evidence a report of the commission of physicians who examined him. It contained a history, showing that he was in bed seven weeks with typhoid fever in 1904, and had not been so strong since, although he testified that he had been in as good health; that in 1901, a horse fell upon him, fracturing his right leg above the ankle. He was twenty-three years old, and testified that he was earning from $70 to $85 per month.

Exception was taken to the action of the trial court in refusing to let the defendant show what effect upon neurasthenia the pendency of a lawsuit, the interest in and the excitement of the approaching trial, would have. We think this evidence was admissible. Certain remarks of the court and his manner of giving instructions to the jury are complained of, as constituting comments upon the evidence and as calculated to emphasize the importance of certain testimony favorable to plaintiff at the expense of defendant. In view of the disposition which we propose to make of the case, we think it unnecessary to go into these matters in detail.

Appellant makes no denial of its liability, but contends that the verdict was excessive, and asks to have the amount of the judgment reduced.

Taking into consideration all of the evidence in this case, and viewing it from any reasonable standpoint, as favorably as possible to respondent, we are unable to find justification for a verdict in the amount returned by the jury. The case was prosecuted upon the theory that the damages sustained by plaintiff arose principally from the injuries to his back, and the issue became sharply defined as to whether those injuries had produced a condition of neurasthenia or myelitis. It was conceded that, if it were the latter, the damages should be greater than if the condition were the former. The evidence as it appears from this record is overwhelmingly in favor of the defendant's contention. There were six of defendant's doctors to two of plaintiff's, and it cannot be seriously contended that the evidence of each of these doctors does not compare at least favorably with that of plaintiff's physicians. In many particulars it is much more reasonable and satisfactory. Neither of plaintiff's physicians claims to have had any extended special practice or experience in nervous ailments. We recognize the fact that a jury and trial court have the advantage of seeing and hearing the witnesses and observing their demeanor upon the witness stand. But, making full allowance for this and also for the fact that reasonable men may differ considerably as to what is a suitable award in a case of this character, we are constrained to hold that no jury should, or could properly, base a verdict exceeding $5,000 in amount upon the evidence adduced in this case. If we were fixing the amount, as an original proposition, we would place it at a lower figure.

The case is reversed and remanded to the lower court with the following instructions: The respondent shall have thirty days after filing of the remittitur in the superior court within which to remit all of the judgment in excess of $5,000. If such remission be made, the judgment will stand affirmed; but if not, a new trial shall be ordered.

HADLEY, C. J., MOUNT, and CROW, JJ., concur.

RUDKIN, J. (dissenting)—The majority opinion holds that the court below erred in excluding testimony tending to show the effect that the worry and excitement incident to the pendency of a lawsuit would have on the disease from which the respondent was suffering, and in that conclusion I concur; but I cannot concur in the final disposition made of the case. Doubtless, where the injury resulting from an error committed in the trial of a cause can be segregated from the amount of the verdict, which is otherwise supported by the testimony, the judgment may be affirmed for the residue, on the remission of the excess by the prevailing party; but where it is impossible or impracticable for the appellate court to ascertain or determine the extent to which the verdict has been affected by the erroneous ruling a new trial must be awarded.    In *St. Louis etc. R. Co. v. Hall*, 53 Ark. 7, 13 S. W. 138, the court said:

"The difficulties which would beset a court in determining the justness or excessiveness of a verdict based upon these premises alone would not be inconsiderable. But superadd the element of punitive damages, erroneously allowed, and the process by which the court is to dissect the verdict, eliminate the error, eliminate the excess of compensation, and settle upon the exact sum which plaintiff's case entitles him to have, 'passeth all understanding.'   To attempt it, we think, would be in violation of the spirit of the consitution, which intends that every litigant shall have a trial of his cause before an impartial jury upon proper declarations of the law."

In *Houston etc. R. Co. v. Bird* (Tex. Civ. App.), 48 S. W. 756, the court said:

"In the absence of evidence from which the jury could properly ascertain the amount of loss sustained in impairment of ability to earn money, it was error for the court to submit this element to the jury, and because of the absence of such evidence we think also that the verdict is excessive.   What would be a proper amount, with appropriate evidence on the points indicated, this court cannot, of course, determine, and,

since there was error in the charge, it cannot be cured by a remitter."

To the same effect see: *Chicago etc. R. Co. v. Hall*, 90 Ill. 42; *Seeman v. Feeney*, 19 Minn. 79; *Slattery v. St. Louis*, 120 Mo. 183, 25 S. W. 521; *Thompson v. Lumley*, 7 Daly 74; 3 Cyc. 439.

If competent material testimony was excluded from the consideration of the jury, and is not now before this court, how the majority can say what the judgment should be, likewise "passeth all understanding." To have reached the conclusion announced, the members of the court must have turned jurors and expert witnesses as well. In effect the majority has said to the appellant: you were denied a fair trial in the court below, but you must nevertheless submit to the payment of the largest judgment that any reasonable view of an incomplete record will warrant. From such an anomaly I dissent.